IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GREGORY KENT HARRIS | ) |
| | ) |
| v. | ) NO. 3:05-0620 |
| | ) JUDGE CAMPBELL |
| W.L. HAILEY AND COMPANY, INC., et al. | ) ) |
| | |
| W.L.H. HOLDING COMPANY, INC. | ) |
| | ) |
| v. | ) NO. 3:05-0647 |
| | ) JUDGE CAMPBELL |
| GREGORY KENT HARRIS | ) |

MEMORANDUM

Pending before the Court are Defendants' Motion for Summary Judgment (Docket No. 31) and Plaintiff's Motion for Summary Judgment (Docket No. 40). The Court heard argument on the pending Motions on October 26, 2006. For the reasons stated herein, Defendants' Motion for Summary Judgment (Docket No. 31) is GRANTED in part and DENIED in part, and Plaintiff's Motion for Summary Judgment (Docket No. 40) is GRANTED in part and DENIED in part.

FACTS

Plaintiff Gregory Harris is a stockholder and former employee of Defendant W.L. Hailey and Company, Inc. ("W.L. Hailey"), which is a wholly-owned subsidiary of Defendant W.L.H. Holding Company, Inc. ("WLH"). Defendant George David Waller was, at all relevant times, President and a director of both W.L. Hailey and WLH. Defendant Thomas A. Battan was, at all relevant times, an officer and director of W.L. Hailey and WLH. Plaintiff worked for Defendants from April 1996 until he was fired on August 10, 2004.

Plaintiff has asserted numerous claims against Defendants concerning the termination of his employment and its effect on his ownership rights in his shares of WLH stock. Plaintiff's claims for wrongful termination, unjust enrichment, breach of the covenant of good faith and fair dealing, fraud, breach of fiduciary duty and violation of the Tennessee Securities Act were voluntarily dismissed by the Plaintiff. See Docket Nos. 49 and 62. Plaintiff's remaining claims are for breach of contract concerning the repurchase of his stock, his vacation and sick pay, and certain income tax liability.[1]

Over the course of his employment, Plaintiff acquired 90,000 shares of WLH stock. The parties agree that all 90,000 shares are subject to a December 14, 1990 W.L. Hailey and Company, Inc. Stock Ownership Agreement adopted by the W.L. Hailey and Company, Inc. Board of Directors ("the 1990 Agreement").[2] Each time Plaintiff received shares or options to receive shares of WLH stock, he agreed to the terms and conditions of the 1990 Agreement.[3]

Plaintiff owns 10,000 shares of stock represented by Certificate Nos. 359 and 391, which were issued to Plaintiff, at no cost to Plaintiff, through a March 24, 1997 Stock Bonus Agreement. These stock certificates state that they are subject to certain restrictions contained in a Stock Bonus

---

[1] Because the individual Defendants Battan and Waller were not parties to the contract, and as clarified at oral argument, all claims against the individual Defendants have been dismissed.

[2] The Board of Directors adopted a substantially identical WLH Holding Company, Inc. Stock Ownership Agreement in connection with the exchange of shares to WLH stock on March 30, 2002 ("the 2002 Agreement").

[3] The 1990 Agreement provides that the Board of Directors has sole responsibility with regard to the interpretation of the terms of that Agreement. "It is anticipated that situations will arise that are not explicitly covered by this document. In these instances the Board will be responsible for establishing equitable policies in conformity with the intent and spirit of this Agreement." Id., Section VII.

Agreement dated March 24, 1997, and the Stock Ownership Agreement dated December 14, 1990. WLH paid to Plaintiff the funds necessary to pay his tax liability associated with these shares.

Plaintiff owns 10,000 shares of stock represented by Certificate No. 393, which were issued to Plaintiff, at no cost to Plaintiff, through an October 30, 1999 Stock Bonus Agreement. This stock certificate states that it is subject to certain restrictions contained in a Stock Bonus Agreement dated October 30, 1998, and the Stock Ownership Agreement dated December 14, 1990. WLH paid to Plaintiff the funds necessary to pay his tax liability associated with these shares.

Plaintiff owns 10,000 shares of stock represented by Certificate No. 565, which were issued to Plaintiff, at no cost to Plaintiff, through a November 5, 1999 Stock Bonus Agreement. This stock certificate states that it is subject to certain restrictions contained in a Stock Bonus Agreement dated November 5, 1999, and the Stock Ownership Agreement date December 14, 1990. WLH paid to Plaintiff the funds necessary to pay his tax liability associated with these shares.

Plaintiff owns 40,000 shares of stock represented by Certificate Nos. 494, 1098, and 360, which were purchased by Plaintiff, with his own funds, pursuant to a March 24, 1997 Incentive Stock Option Agreement.[4] Stock Certificate 494 states that it is subject to the terms of the W.L. Hailey and Company, Inc. Stock Ownership Agreement and the 1996 Incentive Stock Option Plan. Stock Certificate 1098 states that it is subject to certain restrictions contained in an Incentive Stock Option Agreement dated March 24, 1997, and the Stock Ownership Agreement dated December 14, 1990. Stock Certificate 360 states that it is subject to the terms of the WLH Holding Company, Inc.

---

[4] Defendants claim that this purchase was also pursuant to the 1996 Stock Option Plan, but Plaintiff denies that fact.

Stock Ownership Agreement and an Incentive Stock Option Agreement under the W.L. Hailey and Company, Inc. Stock Plan of 1996.

Plaintiff owns 20,000 shares of stock represented by Certificate Nos. 825 and 1057, which were issued to Plaintiff, at no cost to Plaintiff, through a December 30, 1999 Incentive Stock Option Agreement.[5] These stock certificates state that they are subject to certain restrictions contained in an Incentive Stock Option Agreement dated December 31, 1999, and the Stock Ownership Agreement date December 14, 1990. WLH paid to Plaintiff the funds necessary to pay his tax liability associated with these shares.

In March of 2002, all stockholders in W.L. Hailey, including Plaintiff, exchanged all shares equally for shares in WLH. Plaintiff signed a Confirmation of Ownership document, dated March 31, 2002, in which he acknowledged and agreed that the WLH shares received by him in the exchange "shall continue to be subject to the restrictions set forth in the Stock Ownership Agreement dated December 14, 1990 and any stock bonus plans, stock options plans and other agreements that were applicable to the W.L. Hailey Shares." Docket No. 29.

The issues surrounding Plaintiff's ownership rights in the WLH stock concern interpretation of the documents and the relationships among the various agreements. Additional facts will be discussed as the issues are addressed below.

## SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[5] Defendants claim that this purchase was also pursuant to the 1999 Stock Option Plan, but Plaintiff denies that fact.

4

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 466 (6th Cir. 2003). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. Id.; Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

To prevail, the non-movant must produce specific evidence that demonstrates there is a genuine issue of material fact for trial. Meyers, 341 F.3d at 466. A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. Id. The non-moving party may not rest on mere allegations but must set forth specific facts showing that there is a genuine issue for trial. Hopson, 306 F.3d at 432.

## VALIDITY OF RESTRICTIONS

Plaintiff alleges that the only agreement he wishes to enforce is the 1990 Agreement, which Plaintiff contends entitles him to redemption of all his 90,000 shares at "Stated Value." Plaintiff maintains that any restrictions in the documents executed subsequent to the 1990 Agreement are invalid because they are not specifically referenced in the company's charter and therefore violate the Tennessee Business Corporations Act ("TBCA").

Plaintiff contends that, pursuant to the TBCA, specifically Tenn. Code Ann. §§ 48-16-101 and 48-16-102, Defendants were required to set forth "in reasonable detail in the charter" any limitations or restrictions which were later included in the Stock Option Plans and Incentive Stock Option Agreements. Plaintiff alleges that Defendants' Board of Directors was empowered to determine preferences, limitations and relative rights of the classes of shares only if the charter so provided.

5

Defendants, citing Tenn. Code Ann. § 48-13-102, claim that Tennessee law allows corporations to establish acquisition agreements such as the Stock Bonus Plans, Stock Option Plans and Stock Option Incentive Agreements at issue herein. Also citing Tenn. Code Ann. §§ 48-16-205 and 48-16-208, Defendants argue that the corporation, through its directors, may grant options and impose restrictions on the transfer of shares in the corporation.

Defendants also assert that Plaintiff cannot "pick and choose" the terms of the Stock Plans and Agreements which he wishes to enforce and then argue the other terms are invalid. Defendants maintain that if the Agreements through which Plaintiff acquired his stock are invalid, then Plaintiff's stock was not properly issued to him and he has no stock rights whatsoever. Defendants argue that Plaintiff is estopped to accept the benefits of these acquisition agreements, which he signed and through which he obtained stock, and then contend that any restrictions in those same documents are invalid.[6]

The Court finds that Plaintiff may not ignore the Agreements which he agreed to, signed and benefitted from. Defendants relied upon the terms of the Agreements in offering and issuing stock to Plaintiff. Plaintiff had notice of all terms of the Agreements, including the restrictions and limitations upon redemption. The Court finds that those restrictions and limitations apply.

Plaintiff also contends that, because the 1990 Agreement provides that amendments to that Agreement must be approved by an affirmative vote of shareholders owning 75% of the stock, any restrictions in the subsequent Stock Option Plans or Agreements which were not thus approved are invalid. Defendants argue that the subsequent Stock Option Plans and Agreements did not "amend"

---

[6] Plaintiff contended at oral argument that he did not want to invalidate the Agreements; rather, he asked the Court to hold that the restrictions within the Agreements are ineffective as a matter of law.

6

the 1990 Agreement and, therefore, are not subject to the 75% vote. In addition, Defendants cite to the 2002 Agreement which provides that the stock received by shareholders pursuant to the reorganization and exchange of shares "shall continue to be subject to the restrictions set forth in the Stock Ownership Agreement dated December 14, 1990, any stock bonus plans, stock option plans and other agreements that were applicable to W.L. Hailey shares." More than 75% of the outstanding shareholders, including Plaintiff, signed confirmation of this statement.

The Court finds that the subsequent documents, executed pursuant to the 1990 Agreement, do not "amend" the 1990 Agreement. In any event, more than 75% of the outstanding shareholders, including Plaintiff, agreed to the various restrictions in 2002. For these reasons, the provisions of these subsequent documents are not invalid.

Therefore, Defendants' Motion for Summary Judgment on the validity of the restrictions is GRANTED, and Plaintiff's Motion for Summary Judgment on this issue is DENIED.

## "TERMINATION OF EMPLOYMENT"

Plaintiff argues that certain restrictions on his stock based upon an employee's "termination" apply only if the termination is voluntary, initiated by the employee. In other words, Plaintiff claims that he forfeits his stock only if he voluntarily quits. Defendants contend that "termination" in all the relevant documents means termination by either the employee or the employer, voluntary or involuntary.

Plaintiff was issued 10,000 shares of stock pursuant to a March 24, 1997 Stock Bonus Agreement, 10,000 shares of stock pursuant to a October 30, 1998 Stock Bonus Agreement, and 10,000 shares of stock pursuant to a November 5, 1999 Stock Bonus Agreement. Each of these Stock Bonus Agreements provides that in the event the Employee should terminate employment *for*

7

*any reason* within five years of issuance of the stock, the stock shall be forfeited and surrendered to the Company without any compensation or payment to the Employee. It is clear from the language of these Agreements that "termination," as used therein, applies to both voluntary and involuntary termination.

Plaintiff purchased 40,000 shares of stock pursuant to a March 24, 1997 Incentive Stock Option Agreement. The March 24, 1997 Incentive Stock Option Agreement provides that in the event of the Optionee's [Plaintiff's] Termination of Employment, the Company shall repurchase the Optionee's Common Stock at the prices described in the Stock Option Agreement, based upon the duration of time between the acquisition of the stock and termination. The March 24, 1997 Incentive Stock Option Agreement also provides that capitalized terms therein (such as "Termination of Employment") shall have the meaning set forth in "the Plan." The "Plan" is defined as the Company's Stock Option Plan of 1996, which provides that "Termination of Employment" shall refer to the Optionee's termination of employment with the Company or its Parent or Subsidiary, *with or without cause, voluntary or involuntary*, excluding any termination of employment by reason of the death of the employee. Thus, "termination," as used in the March 24, 1997 Incentive Stock Option Agreement also includes both voluntary and involuntary termination.

Similarly, Plaintiff was issued 20,000 shares of stock pursuant to a December 30, 1999 Incentive Stock Option Agreement. Again, the Stock Option Agreement provides that in the event of the Optionee's Termination of Employment, the Company shall repurchase the Optionee's Common Stock at the prices described in the Stock Option Agreement, based upon the duration of time between the acquisition of the stock and termination. The Stock Option Agreement provides that capitalized terms therein (such as "Termination of Employment") shall have the meaning set

forth in "the Plan." The "Plan" is defined as the 1999 Stock Option Plan. Just as in1996, the 1999 Plan provides that "Termination of Employment" shall refer to the Optionee's termination of employment with the Company or its Parent or Subsidiary, *with or without cause, voluntary or involuntary*, excluding any termination of employment by reason of the death of the employee. Thus, "termination," as used in the December 20, 1999 Incentive Stock Option Agreement also includes both voluntary and involuntary termination.

Finally, the 1990 Agreement, to which all Plaintiff's shares are subject, provides that "terminated employees" include all shareholders who are no longer full time employees of the Company due to *voluntary or involuntary termination*, death, disability or retirement. 1990 Agreement, ¶ V.B.; see also 2002 Agreement, ¶ V.B.

The Court finds that, in light of the above facts and expressed intent of the documents, all references to "termination of employment" which are relevant to the issues herein include both voluntary and involuntary termination. Accordingly, Defendants' Motion for Summary Judgment as to the meaning of "termination of employment" is GRANTED, and Plaintiff's Motion for Summary Judgment on this issue is DENIED.

## VALUES SET BY THE BOARD OF DIRECTORS

The 1990 Agreement and the 2002 Agreement provide that shareholders terminating employment with Defendants are required to sell their stock to the company at the "Stated Value." The 1990 Agreement and the 2002 Agreement define "Stated Value" as the value of one share of the company's stock as determined by the company's board of directors at a meeting called and held in conformity with the corporate by-laws.

The 1996 and 1999 Stock Option Plans provide that the value for redemption of stock thereunder, after three and five years respectively, is "Fair Market Value." "Fair Market Value" is defined in both Stock Option Plans as "the price which the Board of Directors of the Company acting in good faith determines through any reasonable valuation method that a share of Common Stock might change hands between a willing buyer and a willing seller, neither being under a compulsion to buy or to sell and both having reasonable knowledge of the relevant facts."

Plaintiff disputes the measures of "Stated Value" and "Fair Market Value" as determined by Defendants' Board of Directors. The 1990 Agreement provides:

> In determining the value of the Stock, the Board's primary concern will be to value the shares in such a manner as not to jeopardize the continuing operations of the Company or seriously impair its financial integrity. A conservative evaluation policy will be pursued allowing for consistent appreciation in value and designed to avoid sharp price fluctuations. Additionally, the Board will adopt a "Fair Deal" philosophy with regard to evaluating the Stock. It will attempt to value the shares so new shareholders can expect reasonable return on their investment and older shareholders can realize a fair value for the fruits of their labor.

1990 Agreement, Section IV. Plaintiff argues that Defendants' valuations do not comply with these guidelines.

Defendants argue that the Board of Directors, in the exercise of its discretion and business judgment, has (since adoption of the 1990 Agreement) consistently relied on an annual evaluation of the net book value of shares determined by WLH's auditors to set the price of the shares for purposes of the employee stock plan. Both sides have offered expert opinions on this issue.

Each time the Board fixed a valuation during the time period relevant to this litigation, it fixed the valuation, for both "Stated Value" and "Fair Market Value," at the then-current book value of the stock as determined by the company's independent auditors. The Court finds that the Board's valuations are reasonable and within the Board's discretion as stated in the relevant documents. In

10

addition, the Court finds that the Board's valuations, consistently at book value, meet the guidelines set forth in the 1990 Agreement. In addition, the Court notes that Plaintiff did not object when these values were set for purposes of issuing his stock or for purposes of his Section 83(b) elections under the Internal Revenue Code.

Because the Court finds, as a matter of law, that the valuations set by the Board are reasonable and within the Board's discretion, the opinions of the expert witnesses do not create a factual dispute on this issue. Accordingly, Defendants' Motion for Summary Judgment as to the Board's valuations is GRANTED, and Plaintiff's Motion for Summary Judgment on this issue is DENIED.

## DATE OF DETERMINING STATED VALUE

Plaintiff argues that his stock must be valued in accordance with the Stated Value on the date of his firing. Plaintiff maintains that Defendants "required" him to forfeit 30,000 shares of his stock and agree to Defendants' valuation of 30,000 shares in order to redeem his other 30,000 shares of stock. In other words, Plaintiff states that WLH conditioned its willingness to redeem Plaintiff's stock upon certain concessions on his part which he was unwilling to make.

Defendants contend that they requested, at Plaintiff's firing, that he redeem his shares at $14.10, the then-current Stated Value of his shares. Defendants claim that Plaintiff declined and instead chose to defer his redemption to be set at the next March meeting of the Board, where the Stated Value was set at $13.12 per share.

The Court finds that Plaintiff's delay in redeeming his stock was caused by Defendants' actions and, therefore, Plaintiff's stock must be valued on the date of his firing. Accordingly,

11

Defendants' Motion for Summary Judgment on this issue is DENIED, and Plaintiff's Motion for Summary Judgment on this issue is GRANTED.

## VACATION PAY AND SICK LEAVE

Plaintiff claims he is entitled to accrued vacation and sick leave pay. Defendants argue that Plaintiff has no basis, contractual or otherwise, for such a claim. The WLH policy, as expressed in its Benefits Summary and of which Plaintiff had notice, indicates that unused vacation time has no cash value and unused sick leave is not paid out upon an employee's separation from employment.

Plaintiff has provided no evidence of any agreement to pay unused vacation pay and sick leave. In any event, any such alleged agreement would have been insufficiently definite to create a meeting of the minds. Accordingly, Defendants' Motion for Summary Judgment is GRANTED on this issue, and Plaintiff's Motion for Summary Judgment on this issue is DENIED.

## TAX LIABILITY

Plaintiff also claims that he is entitled to reimbursement for income tax liability of $27,885 for his purchase of 10,000 shares of stock on March 1, 2004.[7] Plaintiff alleges that Defendants assured him throughout his employment that the Company would pay the federal tax liability associated with his stock transactions.[8] Defendants argue that, while they voluntarily paid the

---

[7] In light of the Court's ruling on Plaintiff's claim to these particular shares, the issue of tax liability is likely to be moot, as noted by Defendants at oral argument.

[8] Plaintiff has also submitted the Declaration of James P. Bryant, who states that on more than one occasion during his employment with Defendants, Defendants Battan and Waller told him the Company would pay the federal income taxes triggered when "key" employees, such as himself and Gregory Harris, obtained stock either by way of a bonus or the exercise of an option or as a result of an 83(b) election. Docket No. 45, ¶ 3.

12

federal tax liability on certain of Plaintiff's acquisitions of stock, they were under no obligation to do so.

The Court finds that Plaintiff has not demonstrated any meeting of the minds or agreement as to this specific transaction. The alleged promise with regard to tax liability in general for some employees is insufficient to create a genuine issue of material fact. Defendants' Motion for Summary Judgment on this issue is GRANTED, and Plaintiff's Motion for Summary Judgment is DENIED.

## CONCLUSION

For all these reasons, Defendants' Motion for Summary Judgment (Docket No. 31) is GRANTED in part and DENIED in part, and Plaintiff's Motion for Summary Judgment (Docket No. 40) is GRANTED in part and DENIED in part.

Accordingly, the restrictions in the documents at issue are valid and apply to the Plaintiff. "Termination of Employment," as used in the relevant Agreements, means both voluntary and involuntary termination. "Stated Value" and "Fair Market Value" as set by Defendants Board of Directors are reasonable values and control in these transactions. Plaintiff's shares shall be valued as of the date of his firing, August 10, 2004. Plaintiff is not entitled to unused vacation and sick pay, and Defendants are not liable to Plaintiff for any March 2004 tax liability.

In light of these rulings, the parties shall attempt to agree on the total amounts, including interest, owed by Defendants to Plaintiff for his WLH stock. The parties shall file, on or before November 15, 2006, a joint statement regarding the damages owed or, if the parties cannot agree, separate briefs on this issue.

IT IS SO ORDERED.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE